# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

_____
                                        :
RICHARD GARFIELD JONES ,                :
                                        :
                    Plaintiff,          :        **Civil No. 11-748 (FLW)**
                                        :
        v.                              :        **OPINION**
                                        :
COMMISSIONER OF SOCIAL SECURITY,        :
                                        :
                    Defendant.          :
_____:

Richard Garfield Jones ("Plaintiff") appeals from the final decision of the Commissioner of Social Security ("Commissioner"), denying Plaintiff Disability Insurance Benefits and Supplemental Security Insurance Benefits under the Social Security Act ("Act"). The Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). On appeal, Plaintiff contends that the substantial evidence in the Administrative Record ("AR") establishes eligibility for and entitlement to the benefits for which Plaintiff applied. Specifically, Plaintiff argues, inter alia, that the Administrative Law Judge ("ALJ") failed to combine Plaintiff's several medical impairments in conducting his Step Three analysis. After reviewing the administrative record, this Court finds that remand is required for the ALJ to more fully explain his Step Three determination.

## I.    OVERVIEW

### A.    Procedural History

Plaintiff applied for disability insurance benefits on August 23, 2007, alleging that the following impairments rendered him disabled as of February 2nd of that year: residuals of a stroke, psychiatric and psychological conditions, visual conditions, sleep apnea and hypertension.  The application was denied initially on March 4, 2008, and again on reconsideration on May 2, 2008.  Therafter, Plaintiff requested a hearing before an ALJ in a timely manner and the hearing took place before ALJ Richard West on September 22, 2009.  The ALJ denied Plaintiff's application on October 23, 2009.  Plaintiff next filed a Request for Review with the Appeals Council, and the council affirmed the ALJ's ruling on January 8, 2011.  Plaintiff subsequently filed the instant matter with the District Court, seeking further review of the ALJ's decision.

**B.      Background and Medical History**

**1.      Medical Evidence**

On February 1, 2007, Plaintiff was hospitalized at Bayshore Community Hospital for a stroke, also referred to as an acute cerebrovascular accident ("CVA").  Id. at 145-82. While there, he was treated by Padmarekha Rao, M.D., a psychiatrist and neurologist, and Antonios Tsompanidis, D.O. for a right facial droop and poor handgrip on his right side that was consistent with his CVA.  Not long after he had first been admitted, Dr. Tsompanidis noted in a February 11, 2007 discharge summary that Plaintiff "improved

2

tremendously since [admission]." Id. at 146.  Plaintiff was then transferred to the John F. Kennedy Medical Center for rehabilitation.  He was discharged from that facility on February 15, 2007 as having "achieved goals," id. at 146, 183-98, and was directed to continue with outpatient care. Id. at 187.

Several months later, on April 7, 2007 and April 26, 2007, Plaintiff presented to the emergency room at Bayshore Community Hospital with complaints of vertigo.  He was successfully treated with medication and adjustment of his Coumadin levels. Id. at 217-31. Later that same year, on October 16, 2007, Plaintiff was diagnosed with hypertension by Fazal R. Panezai M.D., a cardiologist.  Id. at 273.  At that time, Dr. Panezai noted that Plaintiff had "no obvious neurological impairment."  Id. at 273.  However, a November 2007 MRI and MRA ("magnetic resonance angiography") of the brain showed residual areas of infarction in the left posterior inferior cerebellar artery ("PICA"), right superior cerebellar artery, left midbrain, and left thalamic regions.  Id. at 199.  Those tests further showed flow void in the basilar artery and that the carotid artery and the great vessels were within normal limits.  Id.  Moreover, there was no evidence of luminal irregularity of the vertebral artery.  Id.

From March 2007 to February 2008, Plaintiff also saw Ophthalmic Physicians of Monmouth.   Treatment notes from that practice indicated that Plaintiff had controlled hypertension, 20/20 vision bilaterally, and double vision when looking left or down.  Id.

at 274-84.

On March 14, 2008, Dr. Rao, Plaintiff's treating physician, noted that Plaintiff continued to experience mild double vision ("diplopia") to left lateral gaze, intermittent gait instability, and symptoms of cognitive dysfunction, with poor short-term recall. Id. Dr. Rao completed a neurological examination that revealed mild diplopia in the left lateral gaze and mild weakness of the right facial muscles with a slight droop in the right angle of the mouth. Id. Based on the neurological examination, and the aforesaid MRI and MRA results, Dr. Rao concluded that Plaintiff had multiple ischemic infarcts (strokes) in the posterior circulation due to dissection of the vertebral artery and that he had residual neurological symptoms. Id. Dr. Rao advised Plaintiff to continue taking aspirin as an antiplatlet agent and concluded that Plaintiff did not need any further neurological care. Id.

Around the same time that Plaintiff was being treated by Dr. Rao, on March 4, 2008, a non-examining state agency doctor reviewed the examinations from Drs. Rao, Panezai, and the Ophthalmic Physicians of Monmouth. According to the state doctor, the treating doctors' examinations revealed that Plaintiff's abilities were within normal limits, which meant that Plaintiff was not severely impaired. Id. at 287. On April 16, 2008, another state doctor confirmed this assessment of Plaintiff's impairments. Id. at 288.

Thereafter, Plaintiff's counsel requested a consultative evaluation of Plaintiff by

4

Richard Schuster, Ph.D., on November 24, 2008.  See id. at 291-302.  According to Dr.

Schuster, Plaintiff lost focus or "just stared blankly ahead" at various times during the

evaluation.  Id. at 296-97.  "At other times, when engaged in assignments that required

verbal memory he displayed severe difficulties, lamenting his poor performance."  Id.  Dr.

Schuster concluded:

> It can be conservatively estimated even from [Plaintiff's]
> current functioning that he is an individual of at least average
> inherent intelligence.  Basic cognitive tests still are solidly
> within the average range.  The one conspicuous and abnormal
> performance is noted on tests of verbal memory, both short term and delayed. Nevertheless immediate attending in the visual or auditory
> modalities is also within the average range.  Visual memory is also within the average
> range.  Processing speed is inconsistent; motor skills are inconsistent, with below
> expectations; tests emphasizing conceptual shifting and response inhibitions are also only
> marginally within expected parameters.

Id. at 299.  Dr. Schuster then suggested that further examination was required:

> These latter realms may represent areas of neuropsychological
> deficiency but require additional neuropsychological
> investigation to confirm.  Clearly, his history, presentation and
> test results highlight significant deficits with verbal memory.
> There are also concerns in regard to dizziness affecting his
> ability to work in a physically-oriented job.  The extent of his
> dizziness and vertigo problems should also be investigated in
> greater detail.  Possibly, vestibular training may be helpful in
> this regard.  Cognitive retraining may also be beneficial.

Id.

Approximately a year following Dr. Schuster's examination, on October 8, 2009, Dr.

Rao noted that Plaintiff had reported continued symptoms of diplopia to left lateral gaze.

Id. at 303.   Dr. Rao further noted that Plaintiff continued to complain of intermittent episodes of dizziness, and that certain movements of the head and external noises seemed to aggravate his symptoms.  Id. at 303.  Moreover, Plaintiff complained of tremors in his left hand and explained that he was unable to concentrate on the computer for extended periods of time.  Id.  Dr. Rao concluded that Plaintiff's mental status was normal, that there was no evidence of disorientation or impaired concentration, that his speech was fluent with intact comprehension and, notably, that his short-term recall, remote memory, and fund of knowledge were intact.  Id.  However, Plaintiff's diplopia on left lateral gaze with weakness of abduction of the left persisted.  Id.  Other neurological tests were normal with the exception of tandem walking and Romberg testing.  Id. at 303-04.  Based on these findings, Dr. Rao concluded that Plaintiff had "continued neurological dysfunction with poor coordination, diplopia to left lateral gaze, and gait instability. He is disabled permanently on account of his residual neurological dysfunction."  Id. at 304.

### 2.      Testimonial Evidence

Plaintiff, a former HVAC refrigeration technician and a carpenter, testified at the hearing that he was born in 1968 and achieved a tenth grade education.  Id. at 30-31.  According to Plaintiff, he has been disabled since February 2, 2007, after having suffered from the aforementioned stroke.  Following the stroke, Plaintiff began to experience headaches and difficulty rotating his head.  Id. at 32-39.  In addition, Plaintiff claims that

6

he would become light-headed if he suddenly dealt with aggravation or stress or stared at a computer screen, certain colors, or lights, for over 15 minutes.  Id. at 32-39.  Plaintiff further claims that he becomes easily agitated and, notably, that he experiences short-term memory loss.  Id. at 40-41.  In terms of physical limitations, Plaintiff asserts that his left hand has become shaky and unsteady, which makes it difficult for him to grab or hold anything with that hand.  Id. at 32.

According to Plaintiff, the stroke also caused him to become light-headed, unsteady, and/or dizzy if he suddenly or sharply moved his head by either looking up or sideways.  Specifically, he testified that if he turns his head and holds it in that position for "15 minutes or so" he will experience pain and dizziness.  Id. at 37.  If, however, he is otherwise aggravated by a stressful circumstance, for example, he could experience the same symptoms after having held his head in a turned position for only "a minute."  Id.  Once he began to experience lightheadedness as a result of "side-to-side" head-turning, he could suffer from the lightheadedness for three to four hours.  Id. at 38-39.

In terms of daily activities, Plaintiff testified that he works on the computer for up to thirty minutes at a time, fixes video games, and does some work in the yard.  Id. at 42.  He also performs light cleaning around the house.  Id. at 42-43.

Plaintiff's girlfriend, Tracey Bloomer, also testified at Plaintiff's ALJ hearing.  She testified that Plaintiff "has to be reminded pretty much on a daily basis of anything that is

either coming up, or things like taking his medication." Id. at 46. Moreover, she testified that if he "looks to the left too far one way, sometimes he'll get dizzy." Id. In addition, she noted that prolonged periods in front of the television or computer leave him dizzy and quiet. Id. at 48.

### 3.      Vocational Testimony

Vocational expert Rocco Miola testified at the hearing. The ALJ posed the following hypothetical question to the expert:

> I'm going to ask you to assume an individual 41 years of age, who has – highest education is completion of ninth grade, and who is able to communicate in English. I'd ask you to further assume the individual is limited to light exertional duty, light exertional duties [sic]; cannot climb ladders, ropes, or scaffolds; and can perform other postural functions only occasionally; who is limited to only occasional turning of the head either sideways, or up, or down; who must avoid, as part of their regular job responsibilities, sudden, sharp movements of their head; only occasional use of a computer screen; and is limited to three-step instructions. . . . Do you have any opinions as to whether or not someone with that profile [could find work] in the national economy?

Id. at 52-53. The expert responded no to this hypothetical question. Id. at 53. According to the expert, such a person "really would not be able to work in the competitive labor market . . . if the person is unable to even occasionally turn his head from side to side or up and down, that would preclude a majority of jobs . . . in the economy." Id.

The ALJ clarified his hypothetical, asking "[i]f they could do it occasionally,

meaning two hours out of an eight-hour day" whether that amount of head turning would be sufficient.  Id.  Even under that clarified scenario, the vocational expert explained that

> they couldn't do the jobs, because it's not frequent enough . . . when you're doing unskilled type of work at the light or sedentary level, you do have to move your head from side to side or up and down more than occasionally to get the job done.

Id.

More explicitly defining the contours of the limitation, the ALJ queried whether the vocational expert would hold the same opinion for someone who "must avoid having their head in a turned or titled position for more than five minutes at a time; can only occasionally use a computer screen; and is limited to three-step instructions."  Id.  To this hypothetical, the expert responded that "there are jobs [that person] can do . . . in the light level."  Id. at 54.  According to the expert, the type of jobs such a person could do include sorter, produce weigher, assembler, inspector, or machine operator.  Id.

Following the vocational expert's testimony, the ALJ asked Plaintiff's counsel to expound upon what medical evidence addressed Plaintiff's "ability to turn the neck in different directions with regard to either the . . . amount of time . . . in such positions."  Id. at 54.  Plaintiff's counsel responded that the ALJ should consult the treating physician's report and consider Dr. Shuster's acknowledgment that further testing was needed to address Plaintiff's vertigo and dizziness symptoms.  Id. at 56.   The ALJ commented that

he "really [had] to take a very close look at the medical support . . . with regard to the neck . . . turning limitations."  Id. at 57.  He was so required because "what Social Security require[s] [him] to do is not simply accept descriptions of symptoms, no matter how convinced [he is] of their accuracy; . . . any symptoms [must] be supported, or at least consistent with medical diagnoses and opinions ...."  Id.

### C.    The ALJ's Decision

The ALJ followed the five-step sequential evaluation process in reaching the conclusion that Plaintiff was not entitled to benefits.  The ALJ began by finding that Plaintiff met the insured status requirement of the Social Security Act.  AR at 16. Turning to the five-step process, the ALJ determined at Step One that Plaintiff had not engaged in substantial gainful activity since February 2, 2007, his alleged onset date. Id. At Step Two, the ALJ determined that Plaintiff had the following severe impairments during the relevant period:  status-post cerebrovascular accident, diplopia to left lateral gaze, cognitive dysfunction, sleep apnea and hypertension.  Id.

However, at Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments under the SSA that would automatically render Plaintiff disabled.  Id.  In that regard, the ALJ noted that Plaintiff's mental impairment did not meet or medically equal the criteria of listing 12.02.  In reaching that determination, the ALJ considered whether the

10

"paragraph B" criteria were satisfied by a showing that Plaintiff's mental impairment results in a marked restriction of activities of daily living; marked difficulties in maintaining social function; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  Id.

Specifically, the ALJ concluded that Plaintiff did not experience restrictions in daily living activities, difficulties in social function, or episodes of repeated decompensation.  Id. at AR at 17.  Of note, the ALJ considered the mental consultative exam in which Plaintiff was found to be of at least average intelligence but suffered from impaired verbal memory. While acknowledging that this evidence demonstrated that Plaintiff experienced moderate difficulties in maintaining concentration, persistence, or pace, the ALJ reasoned that only one limitation is insufficient—a claimant must possess two limitations in order for the "paragraph B" criteria to be satisfied.[1]  The ALJ further noted that this assessment of the severity of Plaintiff's mental impairment would be reflected in the ALJ's residual functional capacity ("RFC") analysis.

At Step Four, the ALJ concluded that Plaintiff had the residual functional capacity to perform light work as defined by 20 C.F.R. § 404.1567(b).  The limitations found by the ALJ were that Plaintiff could not climb ladders, ropes or scaffolds; that he could perform other postural functions only occasionally; that he must avoid sudden or sharp movements

---

[1]      In addition, the ALJ concluded that Plaintiff did not satisfy "paragraph C" criteria.  This aspect of the ALJ's ruling is not challenged on appeal.

of the head; that he is limited to only occasional use of a computer screen; and that he must avoid maintaining his head in a turned position for more than five minutes at a time.  Id. In reaching this determination, the ALJ considered Plaintiffs' testimony that, inter alia, he had difficulty rotating his head to the left or right, and that such rotation led to dizziness. Id. at 18.  In addition, the ALJ considered the medical evidence, including Dr. Schuster's opinion that Plaintiff is of at least average inherent intelligence with basic cognitive tests solidly within the average range, as well as Dr. Schuster's test results indicating significant deficits with Plaintiff's verbal memory.  Id. at 19.

After concluding that Plaintiff could perform light work, the ALJ concluded at Step Five that, considering Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff was not disabled from February 2, 2007 through the date of decision.  Id. at 20.  The ALJ relied heavily on the vocational expert's testimony that an individual with Plaintiff's limitations would be able to perform the requirements of representative occupations such as sorter, assembler, or inspector.  Id.

Following the ALJ's decision, Plaintiff sought review by the Appeals Council of the Office of Disability Adjudication and Review.  See id. at AR 7-10.  The ALJ's decision was affirmed.  Id. at 1-3.  Plaintiff then filed the instant suit seeking further review of his denial of disability benefits.

## II.     DISCUSSION

A.      **Standard of Review**

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); see Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings have support by such evidence, Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential.   Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate."  Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the

evidence. See Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986).

**B.      Standard for Entitlement of Benefits**

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. See 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); see Plummer, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. 42 U.S.C. § 1382c(a)(3)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. See 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he is not currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a); see Bowen v. Yuckert, 482 U.S. 137, 146-47 n. 5, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If a claimant is presently engaged in any form of

substantial gainful activity, he is automatically denied disability benefits.  See 20 C.F.R. § 404.1520(b); see also Bowen, 482 U.S. at 140.  Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c); see Bowen, 482 U.S. at 146-7 n.5.  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b).  These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." Id.  A claimant who does not have a severe impairment is not considered disabled. 20 C.F.R. § 404.1520(c); see Plummer, 186 F.3d at 428.  Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to any listed impairment. 20 C.F.R. § 404.1520(a)(4) (iii). If the claimant demonstrates that his impairments are equal in severity to, or meet any listed impairment, the claimant has satisfied his burden of proof and is automatically entitled to benefits.  See 20 C.F.R. § 404.1520(d); see also Bowen, 482 U.S. at 146-47 n.5.  If the specific impairment is not listed, the ALJ will consider in his decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent.  See 20 C.F.R. § 404.1526(a).  If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment.  Id.  An impairment or combination of impairments is basically equivalent to a listed impairment

15

if there are medical findings equal in severity to all the criteria for the one most similar. Williams, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at Step Four whether he retains the RFC to perform his past relevant work. 20 C.F.R. § 404.1520(e); Bowen, 482 U.S. at 141. If the claimant is able to perform his previous work, the claimant is determined to not be under a disability. 20 C.F.R. §§ 404.1520(e), 416.920(e); Bowen, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. Plummer, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." Bowen, 482 U.S. at 146-47 n.5; Plummer, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. Id.

C.    Plaintiff's Arguments on Appeal

Plaintiff makes three arguments on appeal. First, Plaintiff argues that the ALJ's Step Three finding is erroneous because the ALJ failed to combine Plaintiff's several medical

impairments and compare them to analogous Appendix 1 listings.  Second, Plaintiff argues that the ALJ's residual functional capacity determination is not based on substantial evidence because it fails to take in account Plaintiff's cognitive dysfunction.[2]  Finally, Plaintiff argues that the hypothetical posed to the vocational expert does not properly reflect the medical evidence related to the Plaintiff's neck turning limitation.  I address each argument in turn.

### 1.    Failure to Combine Medical Impairments at Step Three

Plaintiff argues that, in his Step Three Analysis, the ALJ failed to address whether the combination of his impairments specified in Step Two—status-post cerebrovascular accident, diplopia to left lateral gaze, cognitive dysfunction, sleep apnea and hyptertension— meets or medically equals one of the listed impairments in 20 C.F.R. § Part 404, Subpart P, Appendix 1.  In the ALJ's decision, his Step Three analysis begins with the heading "The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments."  AR at 16.  However, in his ensuing discussion under that heading, the ALJ discusses only Plaintiff's "mental impairment" and does not engage in an analysis of Plaintiff's multiple impairments in combination.  See id. at 16-17 (discussing whether Plaintiff's mental impairment meets or

---

[2]      The Commissioner characterizes Plaintiff's cognitive dysfunction challenge as relating to the ALJ's RFC determination and his posing of a hypothetical to the vocational expert.  I disagree, and read Plaintiff's challenge as directed solely to the ALJ's RFC determination.

medically equals the criteria of listing 12.02).  According to Plaintiff, this renders the ALJ's decision "unreviewable" under the Third Circuit's decision in <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 118-119 (3d Cir. 2000).

It is well-established that an ALJ's conclusion that a claimant's impairments do not meet or equal any Listed Impairment without "identifying the relevant listed impairments, discussing the evidence, or explaining [the] reasoning" constitutes error requiring remand. <u>See id.</u> at 119. For example, in <u>Burnett</u>, the Third Circuit found an ALJ's conclusory statement that the claimant failed to meet any listing "hopelessly inadequate" and remanded the case for a full discussion of the evidence and explanation of the ALJ's reasoning.  <u>Id.</u> at 119–120.

However, in <u>Jones v. Barnhart</u>, 364 F.3d 501 (3d Cir.2004), the Third Circuit clarified that the purpose of <u>Burnett</u> was to guarantee "sufficient development of the record and explanation of findings to permit meaningful review" of step-three determinations. <u>Jones</u>, 364 F.3d at 505.  Moreover, the Third Circuit noted that an ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis," but that the decision "read as a whole" must be capable of providing meaningful judicial review. <u>Id.</u>  Therefore, as long as there is sufficient analysis of Plaintiff's impairments when the ALJ's decision is read as a whole, then the decision is reviewable and "<u>Burnett</u> is inapposite."  <u>See</u> <u>Cadillac v. Barnhart</u>, 84 Fed.Appx. 163, 167 n.4 (3d Cir. 2003).  <u>See</u>

also Scuderi v. Commissioner of Social Sec., 302 Fed.Appx. 88, 90 (3d Cir. 2008) ("an ALJ need not specifically mention any of the listed impairments in order to make a judicially reviewable finding, provided that the ALJ's decision clearly analyzes and evaluates the relevant medical evidence as it relates to the Listing requirements.").

Reading the ALJ's decision as a whole, it does not appear that he considered each of Plaintiff's impairments separately or in combination, or that he clearly analyzed and evaluated all the relevant medical evidence as it relates to the applicable Listing requirements.  In his RFC analysis, he discusses Plaintiff's medical history with regard to his acute cerebrovascular accident (stroke) on February 1, 2007, and his mild diplopia.  The ALJ makes no mention, however, of Plaintiff's sleep apnea or hypertension anywhere in his ruling.

The Commissioner argues in his brief that the there is sufficient record evidence to support a finding that Plaintiff does not meet the applicable listings of Listing 11.06 for Parkinsonian syndrome, Listing 11.07 for cerebral palsy, and Listings 2.02 and 2.04 for visual deficiencies.  But these listings appear to focus solely on Plaintiff's stroke-related impairments and do not address his sleep apnea or hypertension.  Moreover, the Third Circuit has noted that "general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."  Diaz v. Commissioner of Social Sec., 410 Fed.Appx. 430, 433

(3d Cir. 2010) (quoting Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003)).  "[T]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." Fargnoli v. Massanari, 247 F.3d 34, 44 n. 7 (3d Cir. 2001).

The Court is aware that Plaintiff has not highlighted the specific listings that should have applied either.  In some instances remand may not be required where the "Plaintiff does not point to any evidence that would establish any of these factors, and indeed, the records of Plaintiff's physicians do not contain any opinions that would have led the ALJ to find that Plaintiff satisfied these conditions." Gainey v. Astrue, No. 10–1912, 2011 WL 1560865, *12 (D.N.J. Apr. 25, 2011) (citing Giese v. Comm'r of Soc. Sec., 251 Fed. Appx. 799, 804 (3rd Cir. 2007)).  In this case, I find remand appropriate because the ALJ's decision does not address two of Plaintiff's impairments at all and there is little analysis of the Plaintiff's stroke-related conditions throughout the decision.  Compare Gainey, supra at *13 (concluding that ALJ gave sufficient consideration to the claimant's combination of impairments where the ALJ explained that "no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment," and the ALJ described in detail whether Plaintiff's impairments met listed conditions, and recounted Plaintiff's numerous treatments).  The only impairment addressed in detail in the decision here is Plaintiff's mental impairment.

Without the ALJ having addressed each of Plaintiff's severe impairments in the decision, the Court cannot conduct meaningful judicial review of the ALJ's Step Three findings. Accordingly, remand is required. On remand, the ALJ shall explain his findings at Step Three, including an analysis of whether and why Plaintiff's status-post cerebrovascular accident, diplopia to left lateral gaze, cognitive dysfunction, sleep apnea and hyptertension in combination, are or are not equivalent in severity to one of the listed impairments.  Accord Torres v. Commissioner of Social Security, 279 Fed.Appx. 149, 152 (3d Cir. 2008) (remanding and directing ALJ to consider each of claimant's impairments in combination).

### 2.      Remaining Arguments

Although I have determined that remand is required, I briefly address Plaintiff's additional arguments for the sake of completeness. As noted, Plaintiff argues that the ALJ failed to take into account his cognitive dysfunction, i.e., moderate impairment in concentration, persistence, or pace, in reaching the Step Four RFC determination that Plaintiff may perform unskilled, light work.  I can not address this issue at this juncture because the ALJ's Step Four RFC determination may be augmented on remand once he more fully addresses Plaintiff's impairments in his Step Three analysis.

Plaintiff next argues that the hypothetical question posed to the vocational expert was not supported by substantial evidence.  An expert's testimony concerning  the

Plaintiff's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays his physical and mental impairments.  See Burns, 312 F.3d at 123 ("A hypothetical question posed to a vocational expert must reflect all of [ ] [Plaintiff's] impairments.")  Id.  Hence, "[w]here there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence."  Id.

As explained above, vocational expert Rocco Miola testified at the hearing that there were no jobs in the national economy in response to the following hypothetical question:

> I'm going to ask you to assume an individual 41 years of age, who has – highest education is completion of ninth grade, and who is able to communicate in English.  I'd ask you to further assume the individual is limited to light exertional duty, light exertional duties [sic]; cannot climb ladders, ropes, or scaffolds; and can perform other postural functions only occasionally; who is limited to only occasional turning of the head either sideways, or up, or down; who must avoid, as part of their regular job responsibilities, sudden, sharp movements of their head; only occasional use of a computer screen; and is limited to three-step instructions. . . . Do you have any opinions as to whether or not someone with that profile [could find work] in the national economy?

Id. at 52-53.  The expert also answered "no" to the following clarification of the ALJ's hypothetical:  "[i]f they could do it occasionally, meaning two hours out of an eight-hour day but that would be the most they could do it?"  Id.

22

Thereafter, the ALJ queried whether the vocational expert would hold the same opinion for someone who "must avoid having their head in a turned or titled position for more than five minutes at a time ...." Id.  The expert responded that "there are jobs [that person] can do . . . in the light level" to this hypothetical. Id. at 54. According to the expert, the type of jobs such a person could do include the unskilled work of a sorter, produce weigher, assembler, inspector, or machine operator.  Id.

In Plaintiff's view, the ALJ manipulated the hypothetical in order to justify a finding that Plaintiff was not disabled and, furthermore, the ALJ did not tie his "five minutes at a time" restriction  to record evidence.  As an initial matter, the Court finds Plaintiff's negative characterization of the ALJ's intent unwarranted.  Turning to the merits of Plaintiff's challenge, there is record evidence to support the ALJ's five minute limitation. At the hearing, the ALJ took pains to elicit detailed testimony from the Plaintiff as to the precise nature of his neck tilting/turning limitation.  The ALJ asked Plaintiff:

> Q     [I]f you were just sitting there as you are now . . . but turn your head to the left and start talking to [your attorney] for a while, is that something that would, would give you problems, or, or am I not understanding it right?
>
> A     Yes, I mean, it depends on how long I, I look in that position.
>
> Q     And, and just from your experience, how, how long, on average, would create a problem?

> A        About 15 minutes or so.  Then, then, my head starts.
> But like right now, with being aggravated
> [by  an external event] it could be just looking
> over there for a minute ....

AR at 37 (emphasis added).

As this colloquy illustrates, Plaintiff's own testimony is that he could hold his head in a tilted or turned position for up to 15 minutes at a time.  Although Plaintiff further testified that, when aggravated, he could tilt or turn his head for only one minute at a time, it was reasonable for the ALJ to conclude that, on average, Plaintiff could hold his head in a tilted or turned position for up to five minutes in a single instance.  Contrary to Plaintiff's characterization of the ALJ's motive, in my view, the ALJ gave the Plaintiff the benefit of the doubt in assigning a 5 minute average to Plaintiff's limitation when Plaintiff's own testimony could have supported a lengthier duration.  Thus, there was no error in the ALJ's questioning of the vocational expert.

## III.   Conclusion

For the reasons set forth above, this matter is remanded this case to the ALJ for further proceedings consistent with this Opinion.

Dated: February 27, 2012

/s/ Freda L. Wolfson
Honorable Freda L. Wolfson
United States District Judge